UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

DARREN ENGLERT,                       )
                                      )
                 Petitioner,          )
                                      )
        v.                            )          No. 2:19-cv-00562-JMS-MJD
                                      )
WARDEN,                               )
                                      )
                 Respondent.          )

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

Petitioner Darren Englert pleaded guilty to murder and was convicted of conspiracy to commit criminal confinement after a jury trial in Tippecanoe County, Indiana, in 2013. Mr. Englert now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He argues that his guilty plea was not knowing, intelligent, and voluntary, and that his counsel provided ineffective assistance when counsel persuaded him to plead guilty and failed to file a motion to withdraw the guilty plea or argue the petitioner's pro se motion to withdraw the plea. Because this Court concludes that the Indiana Court of Appeals reasonably applied federal law when deciding these grounds for relief, Mr. Englert's petition for a writ of habeas corpus is **denied** and a certificate of appealability will not issue.

**I.**
**Background**

Federal habeas review requires the Court to "presume that the state court's factual determinations are correct unless the petitioner rebuts the presumption by clear and convincing evidence." *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018); *see* 28 U.S.C. § 2254(e)(1). On direct appeal, the Indiana Court of Appeals summarized the relevant facts and procedural history as follows:

1

Gibson and Carolann Clear began a romantic relationship in May 2011. Shortly thereafter, Clear and her mother, Joanne, moved into Gibson's one bedroom apartment in Lafayette. Gibson, the father of two young children that did not live with him, was employed as a dishwasher at a local restaurant. Neither Clear nor her mother was employed. In June 2011, Gibson and Clear met Englert and Antonio Williams at a party. Both men were unemployed. Shortly thereafter, Gibson invited Englert and Williams to move into his apartment. The two men accepted Gibson's invitation and agreed to help Gibson pay for food and rent. Problems began immediately. Although Clear apparently still considered Gibson to be her boyfriend, she and Englert became involved in a sexual relationship, and Gibson asked Joanne to move out, which angered Clear.

At approximately 2:00 a.m. on July 6, 2011, less than a week after they moved into Gibson's apartment, Englert and Williams attacked Gibson in the kitchen when he returned home from work. Williams was apparently angry because he believed Gibson had "disrespected" Clear. The two men hit Gibson with their fists and kicked him. Gibson, who was much smaller than his attackers, was unable to defend himself.

After beating Gibson, Englert and Williams removed Gibson's clothing, hog-tied his wrists and ankles with a dog collar and belt, threw him in a cold shower, and left him there for ten to fifteen minutes to rinse off his blood.

While Gibson was in the shower, Englert, Williams, and Clear sat in the living room and discussed what to do with Gibson. Clear suggested killing him. Englert and Williams dragged Gibson out of the shower, untied him, and told him to get dressed. Gibson was in no condition to resist at that point, and Williams announced that they were all going for a ride in Joanne's roach-infested compact-sized car. Williams got into the driver's seat, and Gibson was placed in the front seat with a belt around his neck. Englert sat directly behind Gibson and restrained him with the belt. Clear sat next to Englert and taunted Gibson while performing oral sex on Englert.

Williams drove to an acquaintance's house and took a pick axe, a hatchet, a shovel, and a gas can out of the acquaintance's house garage. Englert, Williams, and Clear discussed digging a six foot by six foot hole, beating Gibson, and burying him. Williams then drove out to County Road 500 North in Tippecanoe County. During the drive, Gibson pleaded for his life. He told Englert and Williams that he didn't want to die because he had babies, and that they could have Clear and his SNAP food stamp benefits card.

At some point, Williams stopped the car on the county road, removed Gibson from the vehicle, and placed a plastic bag over his head. Clear removed the tools from the car, and Englert dug a shallow hole next to a corn field. Williams shoved Gibson into the hole, and Englert handed Williams the pick axe. Both Williams and Englert beat Gibson with the tools until he was dead and then removed his bloody clothing. They left the belt around Gibson's neck. Because the hole Englert dug wasn't deep

2

enough to bury Gibson, Englert and Williams put Gibson in a fetal position and covered his body with dirt and corn stalks from a nearby cornfield. Englert and Williams discussed burning Gibson's body, but Clear told them that the nearby trees would catch fire.

Immediately after leaving the scene, Englert, Williams, and Clear drove to a bridge and threw the shovel, pick axe, and hatchet into the Wabash River. They threw Gibson's shoes into a dumpster, and returned to Gibson's apartment to clean up the bloody kitchen. They hid the bloody clothes that Gibson was wearing when he died under the stove. About 7:00 a.m., Englert and Clear used Gibson's SNAP card to purchase soda and snacks at the Village Pantry. Clear telephoned the restaurant that employed Gibson and asked for his paycheck.

Later that day, Englert and Williams drove Joanne's car to an Ace Hardware store where Williams stole a large bag of mulch and a bottle of hydrochloric acid. The two men returned to Gibson's gravesite and poured acid on Gibson to destroy evidence. They also covered Gibson's body with the mulch. The men left the mulch bag and acid bottle in Joanne's car. When they returned to Gibson's apartment, Joanne cleaned out her car and threw the mulch bag and acid bottle in the front yard.

That night, Clear told a friend that Englert and Williams had killed Gibson. The friend called the Lafayette Police Department and reported that Gibson was missing. Lafayette Police Department Officer Shana Wainscott responded to the call at approximately 1:00 a.m. on July 7 and spoke with Clear's friend, who took the officer to Gibson's apartment. Officer Wainscott observed the mulch bag and acid bottle in the front yard. She and Officer Jacob Daubenmeir knocked on the front door, and Joanne invited them in to look around the apartment. The officers noticed Gibson's wallet on the living room floor and asked Joanne to contact Clear. Shortly thereafter, the officers noticed Clear, Williams, and Englert walking down the middle of the street towards the apartment. Although initially cooperative, they all became agitated and aggressive when questioned about Gibson. They eventually refused to answer additional questions and returned to Gibson's apartment. As the officers continued their investigation in the front yard, Englert and Williams came out of the apartment and taunted the officers about failing to arrest them. Later that morning, Officer Daubenmier arrested Englert for minor consumption of alcohol. Marijuana was found in Englert's wallet. When questioned at the police station, Englert gave several false statements as to where Gibson might be. When asked about the cuts and other injuries to his hands, arm, and neck, Englert became agitated and said he injured himself while peeling potatoes.

Officers at Gibson's apartment found Gibson's blood in the shower and on the kitchen floor. The dog collar used to hog-tie Gibson was found on the bathroom floor between the toilet and shower. Gibson's blood was also found on the rubber seal on the trunk of Joanne's car. Officers were eventually able to locate Gibson's burial site with Williams' help. The officers found a blood-stained plastic bag at the side of Gibson's grave. As officers slowly excavated the burial site by removing the

corn stalks, mulch, and dirt, their eyes began to burn from the hydrochloric acid. Williams also directed the officers to the Wabash River where they recovered the pick axe, shovel, and hatchet.

The State charged Englert with Count I, conspiracy to commit murder as a class A felony; Count II, murder; Count III, conspiracy to commit confinement as a class B felony; Count IV, confinement as a class B felony; Count V, conspiracy to commit battery as a class C felony; Count VI, battery as a class C felony; Count VII, conspiracy to commit fraud as a Class D felony; Counts VIII and IX, two counts of fraud as a class D felony; and Count X, possession of marijuana as a class A misdemeanor. Following amendments to the charging information, Englert pleaded guilty to murder in March 2012. He proceeded to trial on the remaining nine counts in November 2012.

*Englert v. State*, 995 N.E.2d 1089, 2013 WL 5658805, *1-3 (Ind. Ct. App. 2013).

The jury convicted Mr. Englert of all charges except the three fraud charges. The trial court merged several of the convictions and, on direct appeal, the Indiana Court of Appeals held that several of the convictions violated Indiana's double jeopardy clause. The court affirmed his convictions for murder and conspiracy to commit criminal confinement. The Indiana Supreme Court denied transfer. Dkt. 7-2 at 4.

Mr. Englert then petitioned for post-conviction relief. After his petition was denied, Mr. Englert argued on appeal that his trial counsel made false statements to coerce him into pleading guilty to murder and failed to move to withdraw his guilty plea. The Indiana Court of Appeals affirmed the denial of Mr. Englert's petition and the Indiana Supreme Court denied his petition to transfer. Dkt. 7-8 at 6-7. Mr. Englert timely filed the instant petition for a writ of habeas corpus on November 22, 2019. Dkt. 2.

## II.
## Applicable Law

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") directs how the Court

must consider petitions for habeas relief under § 2254. "In considering habeas corpus petitions challenging state court convictions, [the Court's] review is governed (and greatly limited) by AEDPA." *Dassey v. Dittmann*, 877 F.3d 297, 301 (7th Cir. 2017) (en banc) (citation and quotation marks omitted). "The standards in 28 U.S.C. § 2254(d) were designed to prevent federal habeas retrials and to ensure that state-court convictions are given effect to the extent possible under law." *Id.* (citation and quotation marks omitted).

A federal habeas court cannot grant relief unless the state court's adjudication of a federal claim on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"The decision federal courts look to is the last reasoned state-court decision to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Dassey*, 877 F.3d at 302. "Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims, and to give appropriate deference to that decision[.]" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (citation and quotation marks omitted). "This is a straightforward inquiry when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion." *Id.* "In that case, a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.*

5

"For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102. "The issue is not whether federal judges agree with the state court decision or even whether the state court decision was correct. The issue is whether the decision was unreasonably wrong under an objective standard." *Dassey*, 877 F.3d at 302. "Put another way, [the Court] ask[s] whether the state court decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103). "The bounds of a reasonable application depend on the nature of the relevant rule. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Schmidt v. Foster*, 911 F.3d 469, 477 (7th Cir. 2018) (en banc) (citation and quotation marks omitted).

### III.
### Discussion

Both of Mr. Englert's grounds for relief rest on his contention that his attorneys advised him to plead open to murder because the State was considering seeking the death penalty or life without parole (LWOP). Mr. Englert states that after entering his guilty plea, he learned that the State was not planning to seek either the death penalty or life without parole, although he does not provide any details of the information he learned. He also alleges that his attorneys told him that the State would drop the other pending charges against him if he pleaded guilty to murder, but the State continued to pursue those charges even after Mr. Englert pleaded guilty.

#### A. Knowing, Intelligent, & Voluntary Plea

Mr. Englert's first ground for relief is that his guilty plea was not knowing, intelligent,

6

and voluntary. The Indiana Court of Appeals correctly identified *Boykin v. Alabama* as the law governing Englert's guilty plea. In order to be sustained, a guilty plea must be accompanied by an affirmative showing that it was intelligent and voluntary. *Boykin v. Alabama*, 395 U.S. 238, 241 (1969). The court then went on to state:

> The record, however, does not indicate that anybody ever threatened Englert that the State would definitely seek the death penalty or LWOP unless he pled guilty or that his counsel believed that such a threat had been made. Moreover, even if such a threat *had* been made, it would not have been idle. It seems clear that Englert was, in fact, eligible for the death penalty or LWOP on at least three grounds.

*Englert v. State*, 132 N.E.3d 932, 2019 WL 4008452, *6 (Ind. Ct. App. 2019).

This was not an unreasonable application of federal law. "[A] plea of guilty is not invalid merely because entered to avoid the possibility of a death penalty." *Brady v. United States*, 397 U.S. 742, 755 (1970). And "[a] defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action." *United States v. Vela*, 740 F.3d 1150, 1153 (7th Cir. 2014) (quoting *Brady,* 397 U.S. at 757).

Although Mr. Englert now believes the State would not have sought the death penalty or LWOP had he not pleaded guilty, he provides no evidence of this other than his own speculation. And there is no allegation that he was not eligible for the death penalty.

The Indiana Court of Appeals reasonably applied federal law when it held that Mr. Englert's guilty plea was knowing, intelligent, and voluntary.

### B.  Ineffective Assistance of Trial Counsel

Mr. Englert's second ground for relief is that his counsel provided ineffective assistance of counsel by advising him to plead open to the murder charge in order to avoid the death penalty,

LWOP, and prosecution on the remaining charges, and by failing to move to withdraw the guilty plea.

A criminal defendant has a right under the Sixth Amendment to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). For a petitioner to establish that "counsel's assistance was so defective as to require reversal," he must make two showings: (1) that counsel rendered deficient performance that (2) prejudiced the petitioner. *Id.* "This inquiry into a lawyer's performance and its effects turns on the facts of the particular case, which must be viewed as of the time of counsel's conduct." *Laux v. Zatecky*, 890 F.3d 666, 673–74 (7th Cir. 2018) (citation and quotation marks omitted). "As for the performance prong, because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight, *Strickland* directs courts to adopt a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 674 (citation and quotation marks omitted). "The prejudice prong requires the defendant or petitioner to 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).

The Indiana Court of Appeals correctly stated the *Strickland* standard before applying it to the facts of Mr. Englert's case. *Englert*, 2019 WL 4008452 at *6-7. The court held that the record did not support Mr. Englert's contention that counsel told Mr. Englert and his family that the State would certainly pursue the death penalty or LWOP if he did not plead guilty to murder. The post-conviction testimony of counsel and Mr. Englert and his parents conflicted as to whether counsel ever met with Mr. Englert's parents at the jail. But even assuming counsel met with Mr. Englert and his parents, Mr. Englert's parents did not testify that counsel told them the State would certainly pursue the death penalty or LWOP if Mr. Englert did not plead guilty. Instead,

Mr. Englert's mother testified that counsel said they should try to convince Mr. Englert to plead guilty and that Mr. Englert was not comfortable with pleading guilty for the reasons asserted by counsel. Dkt. 9-3 at 38-39. Mr. Englert's father testified that counsel had a plan to avoid the death penalty, but he recalled no proof that the state intended to seek the death penalty. *Id*. at 43.

Mr. Englert's counsel thought this strategy might yield another benefit in addition to potentially saving Mr. Englert's life and assuring that he had an opportunity to leave prison in the future—they speculated that the State might drop the other charges against Mr. Englert to save the resources necessary for a jury trial once Mr. Englert pleaded guilty to the main charge. The fact that this additional possible benefit did not materialize does not render Mr. Englert's plea involuntary or his counsel's performance deficient. His counsel testified at the post-conviction hearing that this possibility was presented to Mr. Englert as just that—a possibility rather than a promise. *Id*. at 25.

Mr. Englert's counsel did not perform deficiently when they recommended that he plead guilty to murder early in the prosecution to avoid the possibility of the State seeking either the death penalty or LWOP. Trial counsel's strategic decision was based on their reasonable understanding of the state's plans for the case and is therefore "virtually unchallengable." *Strickland*, 466 U.S. at 691. The Indiana Court of Appeals' decision on this issue was not unreasonable.

As to his claim that his counsel should have argued for the withdrawal of his guilty plea, the Indiana Court of Appeals applied Indiana law regarding the withdrawal of guilty pleas and concluded that Mr. Englert had not established any valid reason for withdrawal under the state statute. *Englert*, 2019 WL 4008452 at *8 (citing Indiana Code § 35-35-1-4(b)).

"A federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Walker v. Martin*, 562 U.S. 307, 315 (2011) (citation and internal quotation marks omitted). The state-law ground precluding review by a federal habeas court "may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." *Id.* at 315. "In assessing the adequacy of a state procedural ruling, federal courts do not review the merits of the state court's application of its own procedural rules. Instead, we ask whether the rule invoked was firmly established and regularly followed." *Crockett v. Butler*, 807 F.3d 160, 167 (7th Cir. 2015) (citations and quotations marks omitted). The Indiana statute on the withdrawal of guilty pleas is firmly established and there is no evidence that it is not regularly followed. The Indiana Court of Appeals reasonably concluded that Mr. Englert's counsel did not perform deficiently when counsel failed to argue in support of a meritless withdrawal motion. And the determination that the withdrawal motion was meritless was based in state law and is therefore unreviewable by this Court. Mr. Englert is not entitled to relief on this ground.

## IV.
## Certificate of Appealability

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). Instead, a state prisoner must first obtain a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In deciding whether a certificate of appealability should issue, "the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists

could conclude the issues presented are adequate to deserve encouragement to proceed further."

*Buck*, 137 S. Ct. at 773 (citation and quotation marks omitted).

Rule 11(a) of the Rules Governing Section 2254 Proceedings in the United States District Courts requires the district court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." No reasonable jurist would disagree that the Indiana Court of Appeals reasonably applied federal law when holding that Mr. Englert's counsel did not perform deficiently and that Mr. Englert's guilty plea was knowing, intelligent, and voluntary. Therefore, a certificate of appealability is **denied**.

## V.
## Conclusion

Mr. Englert's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **denied** and a certificate of appealability shall not issue.

Final Judgment in accordance with this decision shall issue.

**IT IS SO ORDERED.**


Date: 1/8/2021

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

DARREN ENGLERT
234580
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Caroline Templeton
INDIANA ATTORNEY GENERAL
caroline.templeton@atg.in.gov